## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-CIV-60409-RAR

**DEBORAH BONETA**, *et al.,*

      Plaintiffs,

v.

**AMERICAN MEDICAL SYSTEMS, INC.,**

      Defendant.

_____/

### <ins>ORDER DENYING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT</ins>

**THIS CAUSE** comes before the Court upon Defendant's Motions for Summary Judgment [ECF Nos. 68, 96], filed on May 4, 2020 and August 25, 2020, respectively.  Defendant asserts it is entitled to summary judgment on the claims brought by Plaintiffs Deborah and Diego Boneta, which seek redress for injuries allegedly caused by Defendant's vaginal mesh devices.  In the first Motion, Defendant maintains that Plaintiffs should be judicially estopped from proceeding on these claims because they failed to disclose the claims as assets in their joint bankruptcy proceeding.  [ECF No. 68] ("First Mot.").  In the second, Defendant asserts that Plaintiffs' claims are barred by the statute of limitations because they accrued more than four years before Plaintiffs filed this lawsuit in December 2015.  [ECF No. 96] ("Second Mot.").   Having considered the parties' written and oral submissions, the record, and applicable case law, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motions for Summary Judgment [ECF Nos. 68, 96] are each **DENIED** as set forth herein.

## BACKGROUND[1]

The analysis of Defendant's arguments requires a detailed recounting of Plaintiffs' bankruptcy proceedings, as well as Ms. Boneta's medical history—with the judicial estoppel inquiry further requiring the Court to consider the interplay between the two. For the sake of simplicity, the Court sets forth the respective timelines of the bankruptcy proceedings and the medical history separately.

### i. *Plaintiffs' Bankruptcy Proceedings*

On December 4, 2010, Plaintiffs filed a petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida. Def.'s Statement of Uncontested Facts ("Def.'s First SOF") [ECF No. 69] ¶ 1. *See also generally In re Boneta*, No. 10-47134-JKO (Bankr. S.D. Fla. filed Dec. 4, 2010). On March 19, 2011, the Plaintiffs filed their Second Amended Chapter 13 Plan ("Plan"), which included a disclosure that "Debtor Diego Boneta ha[d] [a] personal injury claim that may result in damages." Def.'s First SOF, Ex. B [ECF No. 69-2]. This personal injury claim resulted from a car accident involving Mr. Boneta, and the Plaintiffs assured the Bankruptcy Court that "[a]ny recovery w[ould] be paid to the unsecured creditors over and above what is already paid in plan." *Id*. The Bankruptcy Court confirmed the Plan on April 27, 2011. Def.'s First SOF ¶ 4.

On July 11, 2012, Plaintiffs filed a Motion to Approve Personal Injury Settlement wherein they sought approval from the Bankruptcy Court to settle the aforementioned personal injury claim, stating that the settlement proceeds would be used to pay unsecured creditors. *Id*. ¶ 6. On August 17, 2012, the Bankruptcy Court granted this motion. *Id*. ¶ 7. On December 31, 2015, the

---

[1] The facts recited here may not be the "actual" facts of the case but reflect Plaintiffs' best case as the nonmoving party from the record evidence. *See Davis v. Williams*, 451 F.3d 759, 263 (11th Cir. 2006); *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005).

Chapter 13 Trustee filed her Notice of Plan Completion, which verified that Plaintiffs had completed all payments under the Plan. *Id*., Ex. F [ECF No. 69-6]. Significantly, Plaintiffs filed their Complaint in the instant case on that very day. *See* Compl. [ECF No. 1]. The Bankruptcy Court subsequently entered an Order Discharging Debtors on February 9, 2016, Def.'s First SOF, Ex. G [ECF No. 69-7], and, finally, closed the case via a Final Decree entered on June 28, 2016, *id*., Ex. H [ECF No. 69-8]. At no point during the pendency of the bankruptcy proceedings or anytime thereafter did Plaintiffs disclose the existence of the present case to the Bankruptcy Court.

### *ii. Ms. Boneta's Pertinent Medical History*

In April 2006, Ms. Boneta presented to Dr. Daniel Ead with symptoms of stress urinary incontinence as well as pressure on her bladder and pelvis. Def.'s Statement of Uncontested Facts [ECF No. 95] ("Def.'s Second SOF") ¶ 1. Dr. Ead diagnosed Ms. Boneta with mixed urinary incontinence, nocturia, grade 2 cystocele, and female sexual dysfunction. *Id*. ¶ 2.

On May 30, 2006, Dr. Ead implanted two products manufactured by Defendant American Medical Systems, Inc. ("AMS"): the Monarc Subfacial Hammock (a vaginal sling) to treat the stress urinary incontinence and the Perigree System with IntePro (transvaginal mesh) to treat the cystocele. Pls.' Counter Statement of Material Facts [ECF No. 92] ("Pls.' First SOF") ¶ 1. In the months and years following that procedure, she experienced several issues regarding her vaginal health that necessitated recurring visits to various doctors. The relevant medical records and testimony establish the following timeline of post-operation events:

- **December 7, 2007**: Ms. Boneta returns to Dr. Ead complaining of a sensation of mesh in her vaginal introitus (the opening of the vaginal canal) as well as some general vaginal discomfort. Def.'s Second SOF, Ex. D [ECF No. 95-4]. Dr. Ead reports that "[s]he otherwise feels good" and the stress incontinence and cystocele were "resolved with surgery." *Id*. He observes scar tissue in the vaginal introitus and notes that Ms. Boneta "is interested in excision of [the] scar tissue." *Id*. In her deposition, Ms. Boneta testified that she was experiencing "friction" during intercourse, along with general vaginal pain, at this time, and she stated that Dr.

Ead told her it was due to "adhesions or scar tissue." Pls.' Counterstatement of Material Facts ("Pls.' Second SOF"), Ex. B [ECF No. 113-4] ("Boneta Dep.") at 101:24-102:15.

- **March 27, 2008**: Dr. Ead operates on Ms. Boneta in an attempt to address her symptoms. Def.'s Second SOF, Ex. E [ECF No. 95-5]. In the Operative Report, Dr. Ead notes that the procedure was conducted because following Ms. Boneta's "sling procedure[,]" she "had subsequently developed some scar tissue in the vaginal introitus . . . [that] was bothering her intercourse. . . . She wanted to have this removed." *Id*. Dr. Ead notes that "[t]here was no extrusion of the mesh[,]" but after loosening and removing the scar tissue, he did remove some synthetic mesh material. *Id*. One day prior to the surgery, Ms. Boneta signed a pre-admission questionnaire, which described the planned procedure as "transvaginal repair of mesh and scar tissue." *Id*., Ex. F [ECF No. 95-6] at 1. On the day of the surgery, Ms. Boneta signed an informed consent form, which stated that the purpose of the procedure was "transvaginal excision of mesh." *Id*., Ex. G [ECF No. 95-7] at 1.

- **September 11, 2008**: Ms. Boneta returns to Dr. Ead with complaints of dyspareunia (pain during intercourse). *Id*., Ex. I [ECF No. 95-9] at 1. Under patient history, Dr. Ead references Ms. Boneta's mesh implant procedure and notes that she "[p]ostop developed extrusion of mesh." *Id*. Dr. Ead also indicated that he planned to schedule another mesh excision surgery. *Id*. at 2. He does note that there are no signs of cystocele nor stress incontinence—the symptoms the mesh products were meant to treat. *Id*.

- **October 27, 2008**: Ms. Boneta visits Dr. Jabal Uffelman, another gynecologist, who records that she is suffering from "dyspareunia from vaginal mesh" and appears to note that he will "refer for mesh excision." *Id*., Ex. J [ECF No. 95-10].

- **February 16, 2009**: Ms. Boneta returns to Dr. Ead with complaints of urgency and incomplete bladder emptying. Def.'s First SOF, Ex. N [ECF No. 69-14] at 1. She also notes a foul odor in her urine. *Id*. Dr. Ead records the presence of "[v]aginal scar tissue." *Id*. at 2.

- **March 22, 2011**[2]: Ms. Boneta returns to Dr. Uffelman, who diagnoses her with vaginal mesh erosion and documents a plan to "schedule excision of mesh and scar tissue." Def.'s Second SOF, Ex. K. There is no record that either this planned excision—nor the one planned by Dr. Ead at the September 11, 2008 visit—ever occurred, and Ms. Boneta testified that they did not. Boneta Dep. at 79:6-17.

- **April 15, 2014**: Ms. Boneta visits Dr. Carol McKenzie for a PAP smear and complains of pelvic, abdominal, and vaginal pain, as well as "[b]ladder mesh worries." Def.'s Second SOF, Ex. L [ECF No. 95-12] at 2.

---

[2] Ms. Boneta testified that she lost health insurance for a period of time in roughly 2009 or 2010, Boneta Dep. at 111:18-112:12, a possible explanation for the substantial gap in Ms. Boneta's medical records.

- **July 22, 2015**: Ms. Boneta presents to Dr. Uffelman for her annual gynecology exam. Pls.' Second SOF, Ex. I [ECF No. 113-9] ("Uffelman Dep.") at 16:1-18. Dr. Uffelman diagnoses her with urge urinary incontinence and refers her to Dr. Amir Shariati. *Id*. at 20:11-13; *id*., Ex. D [ECF No. 113-4] at 1; Pls.' First SOF, Ex. D [ECF No. 92-4] at 1, 3.

- **August 7, 2015**: Ms. Boneta presents to Dr. Shariati, whose record lists as Ms. Boneta's "problems" the following conditions: "[d]ysuria, [u]rge incontinence of urine, [i]ncontinence without sensory awareness, [i]ncreased frequency of urination, [n]octuria, [u]rgent desire to urinate, [l]ower abdominal pain, [and] [m]echanical complication of device." Pls.' Second SOF, Ex. D at 1. Dr. Shariati recounts that "[p]atient had a sling placed 10 years ago. She states the mesh starting to erode." *Id*. at 2. Dr. Shariati records a finding of "[m]esh erosion of sling" and "[t]he decision was made to proceed with removal of the eroded portion of the mesh as well as cutting the arms as these are causing pain." *Id*. at 4.

- **August 26, 2015**: Dr. Shariati surgically removes Ms. Boneta's mesh and records the following preoperative and postoperative diagnoses: "[m]esh erosion" and "[m]echanical dysfunction of genitourinary device." *Id*. at 6.

According to Plaintiffs, the first time Ms. Boneta attributed her symptoms to Defendant's mesh product was following her first appointment with Dr. Shariati in August 2015. Boneta Dep. 164:17-25; Resp. in Opp. to Def.'s Mot. for Summ. J. [ECF No. 114] ("Resp. to Second Mot.") at 4. Plaintiffs then filed this lawsuit on December 31, 2015.

## LEGAL STANDARD

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the

non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

If there are any factual issues, summary judgment must be denied, and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). Further, when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (alteration added and citation omitted).

## ANALYSIS

Because the judicial estoppel analysis is influenced, at least in part, by the determination of when Plaintiffs' claims accrued, the Court turns first to the statute of limitations analysis and then to the consideration of judicial estoppel.

### A. *The Statute of Limitations*

Defendant argues that Plaintiffs' claims are barred by the applicable four-year statute of limitations. Specifically, Defendant submits that "Plaintiffs' claims accrued no later than March 27, 2008, when Ms. Boneta underwent her first mesh revision surgery." Second Mot. at 7. Plaintiffs, on the other hand, believe the claims accrued upon Dr. Shariati informing Ms. Boneta in August 2015 that the mesh needed to be removed. Resp. to Second Mot. at 10.

Determining when the statute of limitations period begins is a question of fact, and therefore "[i]t cannot be determined upon motion for summary judgment if there is a genuine question as to when it began to run." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000) (citing *In re Beef Indus.*

*Antitrust Litig.*, 600 F.2d 1148, 1169–70 (5th Cir. 1979)).  Because Defendant bears the burden of proof as movant, "it must conclusively show that there exists no disputed issue of fact with respect to the date of commencement of the limitations period."  *List Indus., Inc. v. Wells Fargo Bank, N.A.*, No. 17-CIV-61204, 2020 WL 5534269, at *5 (S.D. Fla. Aug. 6, 2020) (citations and alterations omitted).  This case, like many similar vaginal mesh cases, presents a difficult question as to when exactly the clock began to tick on Plaintiffs' claims.  Reaching an answer requires a detailed analysis of the case law to explain the proper standard before applying that standard to the facts at hand.

Under Florida law, the statute of limitations for a products liability action is four years from the time the cause of action accrues.[3]  FLA. STAT. §§ 95.11(3)(e), 95.031.  Plaintiffs filed this lawsuit on December 31, 2015, so if the claims accrued before December 31, 2011, they are time-barred.  Accrual of these actions is governed by the discovery rule, which means the clock starts on "the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence."  *Id*. § 95.031(2)(b).

The level of knowledge sufficient to begin the limitations period has been a thorny issue for courts and necessarily involves a fact-specific analysis.  In the seminal case on the topic, the Florida Supreme Court concluded that the requisite knowledge "does not rise to that of legal certainty."  *Univ. of Mia. v. Bogorff*, 583 So. 2d 1000, 1004 (Fla. 1991), *holding modified on other grounds by Tanner v. Hartog*, 618 So. 2d 177 (Fla. 1993).  Instead, "[p]laintiffs need only have notice, through the exercise of reasonable diligence, of the *possible* invasion of their legal rights."  *Id*. (emphasis added).

---

[3] As Ms. Boneta was a Florida resident at all relevant times and the implant and revision procedures were performed in Florida, the parties agree that Florida law applies.  *See* Second Mot. at 5 n.2; Resp. to Second Mot. at 9.

In *Bogorff*, a three-year-old child exhibited slurred speech, impaired motor skills, and convulsions—and also entered into a coma—within months of being treated with an allegedly defective medication.  *Id*. at 1001.  The court held that these symptoms constituted a "dramatic change in [] condition" that—when considered with the parents' awareness "of the possible involvement" of the medication—put the parents on notice of their products liability claim against the manufacturer of the medication.  *Id*. at 1004.  In addition, "the [parents] had constructive knowledge of [the] medical opinion that the drug *may* have contributed to the injury" more than four years prior to their filing suit.  *Id*. at 1004.

From *Bogorff*, the Florida Fourth District Court of Appeal interpreted the *Bogorff* test "as having two essential ingredients: an injury distinct in some way from conditions naturally to be expected from the plaintiff's condition, *and* (as opposed to *or* in the medical malpractice context) exposure to the product in question."  *Babush v. Am. Home Prods. Corp.*, 589 So. 2d 1379, 1381 (Fla. 4th DCA 1991) (emphases in original).  "Use of the conjunction 'and' in this equation necessarily implies that the connection" between the product and the injury "must be to some extent causal."  *Id*.  *Babush* thus understood *Bogorff* to be honing in on a plaintiff's knowledge that a product "was a contributing cause of plaintiff's injuries."  *Id*.

The Eleventh Circuit has twice recently provided guidance on how to apply the foregoing standards, with both cases involving alleged defects in vaginal mesh products.  In *Eghnayem v. Boston Sci. Corp.*, 863 F.3d 1104 (11th Cir. 2017), the plaintiff obtained a jury verdict in her favor on her claims under Florida law for injuries she suffered after being implanted with a vaginal mesh device, with the jury concluding that the statute of limitations had not expired because the plaintiff was not on notice of her claim more than four years before she filed suit.  The Eleventh Circuit rejected the defendant's argument on appeal that plaintiff knew or should have known of a possible

invasion of her legal rights when she underwent a procedure to trim exposed mesh after experiencing incontinence.  *Id*. at 1323-24.

Examining Florida case law, the *Eghnayem* court explained that the notice inquiry looks to whether a plaintiff's symptoms were of a type that could have been reasonably expected from a person in her condition even in the absence of negligence.  "[W]hen there is nothing about an injury that would communicate to a reasonable lay person that the injury is more likely a result of some failure of medical care than a natural occurrence that can arise in the absence of medical negligence, the knowledge of the injury itself does not necessarily trigger the running of the statute of limitations.  Because even 'medical treatment competently performed' might cause new unpleasant symptoms, an injury must stand out from the norm to start the statutory clock."  *Id*. at 1324 (quoting *Norsworthy v. Holmes Reg'l Med. Ctr., Inc.*, 598 So. 2d 105, 107-108 (Fla. 4th DCA 1992)).

Applying that standard to the facts in *Eghnayem*, the court found that the plaintiff suffered only one new symptom after surgery "that could have been associated with a defect in the [mesh product]"—urinary incontinence—but "that symptom was not so obviously unusual as to indisputably put [plaintiff] on notice about her claim."  *Id*.  Moreover, the plaintiff's trial testimony that after consulting with her doctor, she believed her incontinence "was related to the mesh repair" was insufficient to establish notice because "'mesh repair' could refer to the implantation surgery, along with any complications, as opposed to the [product] itself."  *Id*.  Consequently, "a jury could have reasonably concluded that [plaintiff]'s injury was not so 'distinct from conditions naturally to be expected from her post-surgical condition,' and so the timeliness of [plaintiff]'s action was properly a question of fact for the jury."  *Id*. (quoting *Babush*, 589 So.2d at 1381).

The Eleventh Circuit revisited the issue shortly thereafter in *Perryman v. Mentor Worldwide LLC (In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.)*, 748 F. App'x 212 (11th Cir. 2018).[4]  There, the plaintiff was surgically implanted with a vaginal mesh device to treat her stress urinary incontinence.  *Id*. at 213.  Although the device resolved her incontinence, the plaintiff began experiencing negative symptoms over the subsequent months, including vaginal infections, a general pain and discomfort in her pelvic region, and pain for both her and her partner during intercourse.  *Id*. at 214.  On multiple occasions, her doctor observed protruding mesh upon inspections and excised it, but the symptoms persisted.  *Id*.  Finally, she went to a new doctor, who recommended and subsequently performed a removal of the mesh, and after completing the removal surgery, the doctor concluded that the sling had eroded through her vaginal tissue.  *Id*.  All of this took place more than four years prior to the plaintiff filing her case. The plaintiff claimed that she "didn't know what caused" her symptoms and that she thought the symptoms were caused by her body "rejecting [the mesh] or something."  *Id*.  She believed that the problems "were related to her personally or perhaps caused by some other factor besides the mesh" and never suspected that the device itself was defective until years after the surgery, when plaintiff saw a television commercial that informed her that her symptoms may have been caused by a defect in the device.  *Id*. at 214–215. The district court granted the defendant's motion for summary judgment, agreeing that the suit was time-barred because the claim accrued, at the latest, when the device was removed.  *Id*. at 215.

---

[4]  Although, as Defendant notes, unpublished opinions are not binding, they may be considered persuasive authority.  11th Cir. R. 36-2.  The Court finds *Perryman* uniquely persuasive given the dearth of authority interpreting *Eghnayem* and the factual similarity to the present case.  *See Redding v. Coloplast Corp.*, No. 6:19-cv-1857-Orl-41GJK, 2020 WL 5983319, at *3 n.4 (M.D. Fla. Feb. 21, 2020) (citing *Perryman* as "highly persuasive" authority).

Citing *Eghnayem*, the Eleventh Circuit reversed, finding that the plaintiff's "symptoms were acknowledged side effects of [the specific mesh product], mesh implants generally, and mesh implant surgery.  In other words, such symptoms could arise from a nondefective mesh that had been implanted through surgery that was properly performed." *Id*. at 217.  The court noted that one doctor even observed that eroded mesh was a "known complication" of the surgery. *Id*.  As a result, the court held that the "[p]laintiff's symptoms were not sufficiently distinct from what might be expected after vaginal surgery to put her on notice of her cause of action as a matter of law." *Id*.

With the Eleventh Circuit's recitation of the law in mind, it is clear to the Court that the Defendant's understanding of the applicable standard is flawed.  The Court takes particular issue with Defendant's assertion that "[c]ritically, a Florida plaintiff need not know that her injury was caused by a 'defect' in the product; knowledge or reason to have knowledge of a connection between the product and her injury are sufficient."   Second Mot. at 6-7.   That is a mischaracterization of the law.

Defendant cites two cases in support of this notice standard.  The first is *Mandeville v. Mentor Corp. (In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.)*, No. 4:13-cv-31, 2016 WL 873814, at *2 (M.D. Ga. Mar. 4, 2016), which stated: "[The plaintiff] did not point to any Florida authority establishing that a plaintiff who knows of a connection between her injuries and a product must also be aware that her injuries may have been caused by a product defect before the statute of limitations begins to run."  However, that case pre-dated *Eghnayem*, which would have made clear this analysis was flawed.  *Mandeville* involved almost identical facts as *Perryman*, and the two cases were decided by the same district court judge.  The district court opinion in *Perryman* explicitly relied on *Mandeville* as controlling authority before ultimately

being reversed by the Eleventh Circuit for running afoul of the analysis in *Eghnayem*. *See Perryman v. Mentor Worldwide LLC (In re Mentor Corp.)*, No. 4:08-MD-2004, 2016 WL 4923039, at *3 (M.D. Ga. Sept. 13, 2016) (noting "it is difficult to distinguish *Mandeville* from [plaintiff's] case"), *rev'd*, 748 F. App'x 212 (11th Cir. 2018).

Defendant also believes that *Bogorff* stands for the proposition that "[t]here need not be knowledge of a defect in the device to trigger the running of the statute." Def's Notice of Supp. Authority [ECF No. 139] at 2 (citing *Bogorff*, 583 So. 2d at 1004). But the portion of *Bogorff* cited by Defendant addressed the medical malpractice claim at issue in that case rather than the products liability claim. *See Bogorff*, 583 So. 2d at 1004 ("In *Barron* we expressly rejected the argument that knowledge of a physical injury, without knowledge that it resulted from a negligent act, failed to trigger the statute of limitation. Rather, we . . . held that the limitation period commences when the plaintiff should have known of *either* (1) the injury or (2) the negligent act.") (emphasis added) (citing *Barron v. Shapiro*, 565 So. 2d 1319 (Fla. 1990)). This distinction is important because notice in products liability claims has always required showing "an injury distinct in some way from conditions naturally to be expected from the plaintiff's condition, *and* (as opposed to *or* in the medical malpractice context) exposure to the product in question. [And] [u]se of the conjunction 'and' in this equation necessarily implies that the connection must be to some extent causal." *Babush*, 589 So. 2d at 1381 (emphasis in original). In other words, the portion of *Bogorff* cited by Defendant has always been understood by Florida courts as articulating a different standard from that stated in the portion of the opinion analyzing the products liability claim.

Moreover, the Florida Supreme Court later modified the *Bogorff* rule cited by Defendant as follows:

> [I]t is important to note that the holding in *Bogorff* was modified by
> our decision in *Tanner v. Hartog*, 618 So. 2d 177 (Fla. 1993).

> *Bogorff* applied the so-called *Nardone* rule: the principle that the limitations period begins to run when the plaintiff knew or should have known that either the injury or the negligence had occurred. *See Nardone v. Reynolds*, 333 So. 2d 25 (Fla. 1976). In *Tanner*, we recognized that a strict application of the *Nardone* rule can sometimes lead to harsh results, especially in cases where "there is nothing about an injury that would communicate to a reasonable lay person that the injury is more likely the result of some failure of medical care than a natural occurrence that can arise in the absence of medical negligence." *Norsworthy v. Holmes Regional Medical Center, Inc.*, 598 So. 2d 105, 107 (Fla. 5th DCA 1992), *approved sub nom. Kronman v. Norsworthy*, 618 So. 2d 186 (Fla. 1993), cited in *Tanner*, 618 So. 2d at 180. Therefore, in *Tanner*, we modified the *Nardone* rule and concluded that "the knowledge of the injury as referred to in the rule as triggering the statute of limitations means not only knowledge of the injury but also knowledge that there is a reasonable possibility that the injury was caused by medical malpractice." 618 So. 2d at 181 (footnote omitted).

*Carter v. Brown & Williamson Tobacco Corp.*, 778 So. 2d 932, 938-39 (Fla. 2000). The Florida Supreme Court thus moved away from the rule cited by Defendant and brought the notice standard applied to medical malpractice actions in line with the standard applied to products liability claims. And it was for this reason that *Eghnayem* referred to "highly analogous" case law from the medical malpractice context in explaining the applicable standard for notice in products liability claims under Florida law. *See Eghnayem*, 873 F.3d at 1323-24 (citing *Norsworthy*, 598 So. 2d at 107-08).

Therefore, Defendant's characterization of the notice standard misses the mark. While a Florida plaintiff need not know the relevant facts with "legal certainty[,]" *Bogorff*, 583 So. 2d at 1004, a plaintiff needs to have actual or constructive knowledge of a *causal* connection between the product and her injury. And this causal connection requires knowledge of a reasonable possibility of a defect. *See Eghayem*, 873 F.3d at 1324 (finding that "[w]hile [plaintiff] did exhibit one new symptom in 2008—urinary incontinence—that could have been associated with a defect in the [product], that symptom was not so obviously unusual as to indisputably put [plaintiff] on

notice about her claim."). Under *Eghnayem*, "[t]he key is whether the injuries suffered after contact with a product were 'sufficiently dramatic to provide notice' that something might be wrong with the product; that is, was there a dramatic change in the patient's condition suggesting a product defect?" *Perryman*, 748 F. App'x at 216 (citing *id*.).

Applying this standard to the facts at hand, there is a genuine issue of fact as to whether Plaintiffs were on notice of their claim more than four years before they filed this lawsuit. Defendant believes that Plaintiffs' claims accrued by March 27, 2008, when Ms. Boneta underwent her first mesh revision surgery because "[b]y that time, Ms. Boneta had complained of the sensation of mesh in her vagina, Ms. Boneta had signed an informed consent to mesh removal, she had been reminded that she was about to undergo mesh removal surgery on her way to the operating room, and the operative report from the surgery indicated that mesh was in fact removed during the procedure." Second Mot. at 7-8. But drawing all reasonable inferences in Plaintiffs' favor—as the Court must at this stage of the proceedings—these facts establish only that Ms. Boneta knew that the implantation of the mesh had resulted in negative symptoms, but not that she knew or should have known of a reasonable possibility that those symptoms were caused by a defect in the product itself.

Ms. Boneta's experience following her mesh implantation surgery—which included exposed mesh, the formation of scar tissue, and symptoms such as dyspareunia, incomplete bladder emptying, and a foul odor in her urine—closely mirrors that of plaintiffs in other cases in which courts have held that the claims did not accrue outside the limitations period as a matter of law. For example, in *Eghnayem*, the plaintiff experienced bleeding and pain during intercourse, incontinence, and pelvic pain and pressure, and a doctor told her there was exposed mesh in her vagina before trimming the mesh to alleviate her symptoms. 873 F.3d at 1311. The only one of

these symptoms "that could have been associated with a defect" was incontinence, and even that was not "sufficiently distinct from what might be expected to put her on notice." *Id*. at 1324; *see also Perryman*, 748 F. App'x at 214 (plaintiff suffered vaginal infections, pelvic pain, urinary retention, and pain and tenderness during intercourse, and doctors excised protruding mesh before ultimately removing it all); *Mason v. Ethicon, Inc.*, No. 6:20-cv-1078-Orl-37Dci,  2020 WL 6270847, at *1-3 (M.D. Fla. Sept. 9, 2020) (rejecting defendants' argument that plaintiff was on notice of her claim against vaginal mesh manufacturer where her post-surgery symptoms included a fever; pain and infection at the surgical site; lack of wound healing; graft exposure; and the need for a second surgery and vaginectomy, which the doctor told the plaintiff "[w]as necessary because the tissue had been damaged by the mesh."); *Redding v. Coloplast Corp.*, No. 6:19-cv-1857-Orl-41GJK, 2020 WL 5983319, at *1, 4 (M.D. Fla. Feb. 21, 2020) (plaintiff was not on notice of her claim against vaginal mesh manufacturer after she experienced pain, pressure, and an unpleasant odor in her pelvic area, and her doctor informed her there was an erosion of the mesh).  Thus, it cannot be said that Ms. Boneta's symptoms put her on notice of her claims.

At the hearing, Defendant argued that this case is distinguishable because the Court need not deduce constructive knowledge from the medical records; instead, in Defendant's view, Ms. Boneta "possessed actual knowledge of possible association between her mesh and her injuries well outside of the limitations period. . . . [And] when she presented to her physicians and reported pain and mesh exposure, her physicians recommended removal of the mesh rather than reassurance that the symptoms were unrelated to the mesh as in *Perryman*."  Resp. to Pls.' Notice of Supp. Authority [ECF No. 143].  But a close look at the record in *Perryman* reveals that the doctors *did* associate the mesh with plaintiff's symptoms.  Indeed, the plaintiff actually had multiple surgeries

removing portions of the mesh.  *Perryman*, 748 F. App'x at 214.  The plaintiff testified to the following:

> Q.  Okay. And so you understood when you were signing this form on November 8th, 2005, that Dr. Patel wanted to remove the ObTape he had implanted in you back in May of 2005?
>
> A.  Yes.
>
> Q.  And the reason you wanted the ObTape removed is because you believed it was causing pain with sex?
>
> A.  And the infections.

App'x, Vol. 1 at 119, Dep. of Patricia Perryman at 123:6-16, *id*.  Although the plaintiff later clarified that she "didn't know what caused" the symptoms of infections and erosion and thought she "was just having an allergy to" the ObTape implant, or her body was "rejecting . . . it or something[,]" *id*., 748 F. App'x at 214, it is clear that she associated her mesh with her injuries, namely her dyspareunia.  And contrary to Defendant's assertions, the doctors in that case recommended removal of the mesh and explicitly connected the mesh with the plaintiff's symptoms.  For example, one doctor testified about an excision procedure that occurred more than eight years before the plaintiff filed her claim:

> Q.  And on October 18th, 2005 did you tell Ms. Perryman that you had cut out a portion of her ObTape?
>
> A.  That's correct.
>
> Q.  And would you have told Ms. Perryman that the protrusion of the ObTape in her vagina was the cause of the discomfort she was feeling with sexual intercourse?
>
> A.  That's correct.
>
> Q.  Would you also have told Ms. Perryman on October 18th, 2005 that the goal of excising the portion of the ObTape that had protruded through her vaginal wall was to relieve that discomfort she was experiencing during intercourse?

A.   That is correct.

App'x, Vol. 1 at 191, Dep. of Dr. Mahesh Patel at 83:4-19, *id.*   This type of exchange between doctor and patient is by no means unique to *Perryman*.   *See Mason*, 2020 WL 6270847, at *1 (plaintiff was not on notice even though her doctor "said [plaintiff's vaginectomy] was necessary because the tissue had been damaged by the mesh."); *Redding*, 2020 WL 59883319, at *4 ("The facts in *Eghnayem* and [*Perryman*] are strikingly similar to the facts before this Court.   Like the Plaintiff here, the plaintiffs in those cases were informed by their doctors that something was wrong with their implants.   But the injuries they suffered, like Plaintiff's here, were not sufficiently different from the symptoms that could have occurred as a result of the surgeries absent any defect to put them on notice.").   Consequently, that Ms. Boneta's doctors recommended and performed excision procedures is not the dispositive factor Defendant believes it to be.[5]

The record evidence shows that Ms. Boneta, like the plaintiff in *Perryman*, "associated" the mesh with her injuries insofar as she knew something was amiss with her vaginal health following the implantation of Defendant's vaginal mesh devices.   But without any actual or constructive knowledge of a reasonable possibility of a defect in the mesh itself, Plaintiffs were not aware of a "possible invasion of their legal rights," so this was not enough to conclude that she was on notice of her claim as a matter of law.   *See Eghnayem*, 873 F.3d at 1324 (looking to symptoms that "could have been *associated with a defect in the [product]*") (emphasis added).

---

[5]   As it is clear that both the doctor and plaintiff in *Perryman* explicitly connected the plaintiff's mesh to her dyspareunia, this significantly diminishes the weight given to the October 2008 record from Dr. Uffelman, which stated that Ms. Boneta was suffering from "dyspareunia from vaginal mesh."   Def.'s Second SOF, Ex. J.   Also, unlike the exchange cited above, Dr. Uffelman was not asked about this portion of the record at his deposition, *see* Uffelman Dep., so it is certainly less persuasive than the record evidence from the doctors in *Perryman*.

As explained above, Ms. Boneta's symptoms were not sufficiently dramatic to conclude as a matter of law that she had constructive knowledge of the reasonable possibility of a defect. In addition, the evidence shows that the first time Plaintiffs conclusively gained actual knowledge of the possibility of a defect was on August 7, 2015, when she presented to Dr. Shariati, who decided to remove the mesh entirely after noting in his record that among Ms. Boneta's "problems" was a "[m]echanical complication of device." Pls.' Second SOF, Ex. D at 1. A reasonable jury could credit Ms. Boneta's testimony that, prior to August 2015, she believed her symptoms resulted from scar tissue formed as a result of the implantation surgery because she was told this by Dr. Ead. *See* Boneta Dep. at 98:12-18; 102:9-15; 120:20-121:8. Dr. Ead testified that the development of scar tissue, dyspareunia, and problems with urinary retention are risks associated with any vaginal surgery, Ead Dep. at 47:12-17, and that Ms. Boneta's "dyspareunia [was] related to the mesh and the scar tissue and the surgery," *id*. at 68:4-21. *See Perryman*, 748 F. App'x at 217 (citing a doctor's testimony that plaintiff's symptoms were a "known complication" in concluding that plaintiff's "symptoms could arise from a nondefective mesh that had been implanted through surgery that was properly performed."); *Marie Renteria v. Ethicon, Inc.*, No. CV 20-5673, 2020 WL 7414744, at *7 (C.D. Cal. Nov. 18, 2020) (finding that plaintiff was not on notice of claim against vaginal mesh manufacturer because "a reasonable jury could find that [her doctor] repeatedly assured Plaintiff in . . . that her pain was normal and caused by surgical scarring, not by the mesh implant itself.").

Because a reasonably jury could find that Plaintiffs' claims accrued on August 7, 2015, the Court cannot conclude as a matter of law that the claims are barred by the statute of limitations. Defendant is therefore not entitled to summary judgment on this basis.

### B.  *Judicial Estoppel*

Defendant argues that Plaintiffs had a duty to disclose the existence of this lawsuit in their bankruptcy case, and their failure to do so means the claims should be barred by judicial estoppel. Generally, judicial estoppel prevents a party who successfully takes a position in a prior judicial proceeding from intentionally asserting a conflicting position in a subsequent action.

Plaintiffs and Defendant dedicate the entirety of their briefs to analyzing the federal law standard of judicial estoppel promulgated by the Eleventh Circuit in *Slater v. U.S. Steel Corp.*, 871 F.3d 1174 (11th Cir. 2017) (*en banc*).  Under that standard, "a district court may apply judicial estoppel when a two-part test is satisfied: the plaintiff (1) took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit and (2) intended to make a mockery of the judicial system."  *Id*. at 1180.  But this standard is wholly inapplicable to this case.

This action is based solely on the Court's diversity jurisdiction.  Compl. at 2.  "In diversity cases, 'the application of the doctrine of judicial estoppel is governed by state law.'"  *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1358 n.7 (11th Cir. 2018) (quoting *Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 44 F.3d 925, 930 (11th Cir. 1995)).  This principle has been consistently applied in this District.  *See, e.g.*, *Mursten v. Caporella*, No. 14-CIV-60014, 2015 WL 12824370, at *3 (S.D. Fla. Feb. 9, 2015) ("Because this is a diversity case, the application of the doctrine of collateral estoppel is governed by state law."); *Jovine v. Abbott Labs, Inc.*, No. 11–CIV–80111, 2011 WL 1337204, at *3 (S.D. Fla. Apr. 7, 2011) ("Because federal subject matter jurisdiction in this case is predicated solely on diversity jurisdiction, the

Court looks to Florida's law of judicial estoppel."); *Osorio v. Dole Food Co.*, No. 07–CIV-22693, 2009 WL 48189, at *15 (S.D. Fla. Jan. 5, 2009) (same).[6]

Under Florida law, a party seeking to assert judicial estoppel must establish four elements, all of which must be present for estoppel to be successfully invoked:

> [1] A claim or position successfully maintained in a former action or judicial proceeding [2] bars a party from making a completely inconsistent claim or taking a clearly conflicting position in a subsequent action or judicial proceeding, [3] to the prejudice of the adverse party, [4] where the parties are the same in both actions, subject to the "special fairness and policy considerations" exception to the mutuality of parties requirement.

*Salazar-Abreu v. Walt Disney Parks and Resorts U.S., Inc.*, 277 So. 3d 629, 631 (Fla. 5th DCA 2018) (citation and footnote omitted). "Stated differently, Florida's rule is that 'judicial estoppel applies when a party in a current proceeding has successfully maintained an inconsistent position in a prior proceeding to the prejudice of the adverse party in the current proceeding.'" *Id.* (quoting *Landmark Funding, Inc. ex rel. Naples Syndications, LLC v. Chaluts*, 213 So. 3d 1078, 1080 (Fla. 2d DCA 2017)). "This requires not only a showing of inconsistent statements, but also the identity of parties (or an exception to that requirement), the successful maintenance of the inconsistent position, and prejudice." *Id.* at 631-32 (citation and quotation omitted).

The parties' misidentification of the legal standard is significant, if not dispositive, because Florida departs from federal law in key respects. "The Eleventh Circuit rule differs from the Florida rule because it does not consider whether the inconsistent claim was successfully asserted in the prior action, whether there was prejudice to the opposing party, or whether there was mutuality of the parties subject to the special fairness and policy considerations exception."

---

[6] Some courts have observed that the "wholesale reliance on the wrong legal standard—indeed, on the wrong jurisdiction's legal regime—provides sufficient grounds, standing alone, to deny [a] [m]otion." *Ryan v. Allstate Ins. Co.*, No. 19-CIV-61120, 2020 WL 7353898, at *2 (S.D. Fla. Dec. 15, 2020). Nevertheless, the Court will consider the merits of Defendant's motion under the appropriate standard.

*Salazar-Abreu*, 277 So. 3d at 633. These latter two factors are fatal to Defendant's attempt to invoke judicial estoppel to preclude Plaintiffs' claims.

In this context, prejudice "occurs when 'the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Grau v. Provident Life and Acc. Ins. Co.*, 899 So. 2d 396, 400 (Fla. 4th DCA 2005) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)). In *Grau*, the Florida Fourth District Court of Appeal reversed the trial court's use of judicial estoppel in a breach of contract case against a disability insurer where the debtor disclosed his disability insurance policy in his bankruptcy case but valued it at zero. *Id*. at 401-402. The court held that because defendants were not parties to the bankruptcy proceedings and were not creditors of the plaintiff, they were not prejudiced by the inconsistent positions. *Id*. at 401.

Other Florida courts have consistently rejected the application of judicial estoppel to bar claims undisclosed in bankruptcy where the defendant seeking to invoke the doctrine was not involved in any way in the bankruptcy proceedings. *See Vining v. Segal*, 773 So. 2d 1243, 1243 (Fla. 3d DCA 2000) (holding a judgment debtor could not assert judicial estoppel in a proceeding to enforce the judgment, where the judgment holder failed to disclose the judgment as an asset in his bankruptcy proceeding); *Ramsey v. Jonassen*, 737 So. 2d 1114 (Fla. 2d DCA 1999) (holding that defendant in legal malpractice action could not use judicial estoppel to bar action where the malpractice plaintiff failed to disclose the claim in her Chapter 11 bankruptcy proceeding). The rationale of the Florida courts in this regard appears to be that the use of judicial estoppel in such circumstances would only serve to hinder a plaintiff's creditors whilst providing a windfall to defendants. *See Losacano v. Deaf and Hearing Connection of Tampa Bay, Inc.*, 988 So. 2d 66, 70 (Fla. 2d DCA 2008) ("Viewed as a two-party dispute, imposition of judicial estoppel may be

unremarkable, but the typical bankruptcy-related flaw in such analysis is the failure to take into account that an unscheduled cause of action is not the debtor's property and that the victims are the debtor's creditors.") (quoting *Cheng v. Diversified Invs., Inc. (In re An-Tze Cheng)*, 308 B.R. 448, 460 (9th Cir. BAP 2004)).

Such is the case here.  Defendant was not involved in any capacity in Plaintiffs' bankruptcy proceedings, so Plaintiffs' failure to disclose this lawsuit did not prejudice them in any way.  While this would not be relevant under federal law, it is critical under Florida law.  *See Yerk v. People for the Ethical Treatment of Animals*, No. 2:09-cv-537-FtM-29SPC, 2010 WL 3746815, at *3 (M.D. Fla. Sept. 21, 2010) ("The issue [of which law to apply in a case deciding whether judicial estoppel barred a claim that plaintiff failed to disclose in bankruptcy] is not academic because [defendant] has the ability to invoke judicial estoppel under Eleventh Circuit authority but not under Florida judicial estoppel principles.") (citing *Grau*, 899 So. 2d at 401).

Finally, "special fairness and policy considerations" do not require the use of judicial estoppel to bar Plaintiffs' claims.  Such considerations "come into play only if" Plaintiffs were using "intentional self-contradiction to obtain an unfair advantage in litigation." *Osorio*, 2009 WL 48189, at *16 (quoting *Grau*, 899 So. 2d at 401).  Here, Plaintiffs contradicted themselves.  They had a duty to disclose this lawsuit in their bankruptcy proceeding, as it accrued no later than August 2015, and they filed their Complaint on December 31, 2015 while their bankruptcy case was still pending.  *See Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1274-75 (11th Cir. 2010) ("It is undisputed that a pending lawsuit seeking monetary compensation qualifies as an asset.  It is also undisputed that such an asset qualifies as property of the bankruptcy estate.  As a result, when [plaintiff] filed her claim . . . while her bankruptcy was still pending, the claim vested in the bankruptcy estate and [plaintiff] had a duty to notice the suit to all creditors.") (internal citations

omitted); *Copeland v. Birmingham Nursing and Rehab. Ctr. E, LLC*, No. 2:14–cv–1523, 2015 WL 4068647, at *4-5 (N.D. Ala. July 1, 2015) (explaining that plaintiff had a duty to disclose her lawsuit even though it arose post-confirmation).  And Plaintiffs' failure to timely amend their bankruptcy schedules to reflect this pending claim—while simultaneously pursing that claim in this Court—constitutes inconsistent positions.  *See Yerk*, 2010 WL 374685, at *4.

However, there is insufficient evidence in the record to conclude that Plaintiffs *intentionally* contradicted themselves.  As explained above, a reasonable jury could conclude that the claims accrued, triggering a duty to disclose this lawsuit, in August 2015, near the end of Plaintiffs' bankruptcy payment plan.  While they clearly possessed a statutory duty to disclose, a reasonable inference can be drawn that such a duty would not have been known to these individual debtors, especially given that they were represented by different counsel in bankruptcy and in the instant suit.  *Accord Montes v. Mastec N. Am., Inc.*, 132 So. 3d 1195, 1197 (Fla. 3d DCA 2014) ("At the time they filed their bankruptcy petition, it was unclear that a lawsuit would be filed at all.  They had a bankruptcy lawyer for their bankruptcy petition, and a different lawyer evaluating their tort claim.  The phrase 'contingent and unliquidated claim' is a legal term that may be confusing to a lay person, particularly when it is as yet undetermined whether a particular [] injury is actionable and ripe for filing.").

Moreover, in light of the clear preference under Florida law to prioritize recovery for creditors over windfalls for defendants, the Court considers Plaintiffs' willingness and request to reopen their bankruptcy case a factor weighing against finding that "special fairness and policy considerations" are present here.[7]  Accordingly, Plaintiffs' claims are not barred by judicial estoppel.

---

[7]  The Court notes, however, that the proper forum for Plaintiffs to seek leave to reopen their bankruptcy case is in the bankruptcy court itself.

## <u>CONCLUSION</u>

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant's Motions

for Summary Judgment [ECF No. 68, 96] are **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 10th day of March, 2021.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**